UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JUNIOR DOUGLAS STEVENSON,

Defendant.

Case No. 21-20375

Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS AND DISMISS INDICTMENT [26, 27]**

After local law enforcement officers found a loaded firearm in Junior Stevenson's car, Stevenson was charged with being a felon in possession of a firearm. Stevenson believes the warrantless seizure of the firearm and his subsequent arrest were unlawful. He now seeks to suppress the firearm and dismiss the indictment. But the officers had both reasonable suspicion to detain Stevenson and probable cause to arrest him. Thus, the motions will be DENIED.

**I.**

The body camera footage of the two officers who detained and ultimately arrested Stevenson captures most of the incident. The officers also prepared incident reports. And one of the officers testified at the suppression hearing. That evidence was all relatively consistent and provides the following factual narrative.

Detroit police officers Joseph Wafer and Joseph Anthony were on routine patrol the night of March 19, 2021. The officers were looking for illegal drugs and

guns. Wafer was driving a marked SUV and Anthony was in the passenger seat. At approximately 11:30 pm, the officers were driving through the parking lot at Larkin's Hall near Michigan Avenue and Larkin streets. They saw a Buick Lacrosse with an individual, later identified as Junior Stevenson, standing just outside the driver's side door with the door three-quarters open.

There is some dispute as to where precisely Stevenson was standing. Anthony's written report places Stevenson in the door jamb—i.e., the wedge between the inside of the car and the open door. (ECF No. 31-1, PageID.164.) During his testimony, however, Anthony recalled Stevenson being in front of the "B-pillar"—the mid-point of the car where the driver door and rear passenger door meet.

Stevenson's car was parked at the end of a row. So there were no cars next to him on the driver's side. There was some low-level lighting in the parking lot. As the officers drove near the Buick, Anthony shined his flashlight into the open door and observed a firearm on the floorboard underneath the driver's seat. Anthony told Wafer that he saw a gun. Wafer stopped the SUV and both officers approached Stevenson as he was closing his driver's side door. (Hrg. Ex. 2, Anthony video at 0:24–0:25.) Wafer asked Anthony, "where?" (*Id*. at 0:30.) Anthony immediately responded, "it's in the car." (*Id*. at 0:31.) Anthony also placed Stevenson in handcuffs. (*Id*. at 0:31.) Wafer asked Stevenson three times if he had a concealed pistol license. (*Id*. at 0:33, 0:35; Hrg. Ex. 3, Wafer video at 0:33, 0:35, 0:37.) In response, Stevenson said, "what? . . . I ain't doin' nothin'." (Ex. 2. at 0:33–0:42.) As Anthony opened the car door, he told Wafer "it's under the seat." (*Id*. at 0:44–0:45.) Anthony then retrieved a loaded 9mm

firearm from under the driver's seat. (*Id*. at 0:47–0:50.) Anthony asked Stevenson again if he had a concealed pistol license. (*Id*. at 0:54.) Stevenson never indicated that he had one.

When Anthony opened the car door to retrieve the firearm, Wafer saw a bag of suspected cocaine in the driver's side door handle. (*Id*. at 0:51.) The officers then placed Stevenson in the back seat of their squad car. Anthony conducted a search of the Law Enforcement Investigation Network. He learned that Stevenson did not have a concealed-license permit. Wafer retrieved an interrogation packet and advised Stevenson of his *Miranda* rights. (Wafer video at 16:50.) Stevenson was arrested for possessing a controlled substance and carrying a concealed weapon. (ECF No. 31-1, PageID.162.)

Following his arrest, Stevenson was ultimately indicted by a federal grand jury on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). (ECF No. 1.)

Stevenson now moves to suppress the firearm that was seized by the Detroit police officers and to dismiss the charges against him. (ECF Nos. 26, 27.) The essence of Stevenson's motions is that his initial seizure was an arrest for which the officers lacked probable cause because there was no way, at that time of night and given the configuration of the car, that Anthony could have seen the firearm under the driver's seat, and that the officers "had no idea whether Stevenson was permitted to possess the alleged firearm." (ECF No. 26, PageID.60; ECF No. 27, PageID.74.) This lack of

probable cause, says Stevenson, also taints the search of the car. Thus, Stevenson contends that the seizure of the firearm violated his Fourth Amendment rights.

**II.**

The Fourth Amendment protects against unreasonable searches and seizures and requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV. "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon 'reasonable suspicion;' and (3) arrests which must be based upon 'probable cause'" that the arrestee has committed or is committing a crime. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citations omitted).

**A.**

Before deciding whether Stevenson's initial detention was an investigative seizure or an arrest, it is helpful to first resolve the key issue of whether Anthony saw a firearm in Stevenson's vehicle.

For starters, Anthony testified under oath that he saw the firearm from the passenger seat of the police vehicle. He explained that when the officers' SUV was about five to 10 feet from Stevenson's car, he shined his flashlight into the car and down under the front seat. He testified that he could see the gun because there was

a small (one to three inch) space between the seat and the floorboard. He immediately said something like "gun, gun, gun." Wafer continued to drive and Anthony told him that there was a gun under the driver's seat. Wafer then stopped the car and the officers approached Stevenson.

Second the officers' contemporaneous body cam footage supports this testimony. A glare in the passenger side mirror of the SUV reveals the point when Anthony turned on his flashlight. (Anthony video at 0:18.) As Anthony is exiting the SUV, he is holding a flashlight. (*Id.* at 0:24–0:25.) Then, as soon as the officers approach Stevenson, Anthony tells Wafer that the gun "is in the car." (*Id.* at 0:31–0:32.) He also says it is "under the seat," which is precisely where the gun was located. (*Id.* at 0:44–0:53.)

Third, a discussion between Stevenson and Wafer after the arrest supports a finding that Anthony saw the gun as the officers approached in their vehicle. As the officers waited with Stevenson to enter the Detroit Detention Center, Stevenson had a conversation with Wafer about the retrieval of the firearm. Stevenson asked Wafer, "what was the cause" for pulling up next to his car. (Wafer video at 1:04:30.) Wafer responded that Anthony "saw the gun." (*Id.* at 1:04:34.) Stevenson asked, "he saw the gun that never moved . . . up under a seat?" and Wafer responded, "yes, how do you think as soon as [Anthony stepped to] you he knew right where it was at and he said it right where it was at?" (*Id.* at 1:04:45.) Wafer further explained that he and Anthony "have an eye for" spotting firearms because they are police officers. (*Id.* at 1:04:53.) Wafer subsequently reiterated "as soon as we got out, [Anthony] said right

where it was at which means he saw it." (*Id*. at 1:05:32.) Stevenson was not convinced. He again asked, "how . . . do you see a gun up under the seat through a tinted car and it is not in no one's hands?" (*Id*. at 1:05:47.) Wafer told him, "you were standing with the door open when we pulled on the side of you." (*Id*. at 1:05:59.)

Even now, Stevenson is unconvinced. He argues it would have been impossible for Anthony to see the firearm under the seat. It is true that the firearm is not visible on the body cam when the six-foot-one Anthony opened the driver's side door and was standing right next to the car.

But Anthony explained, and the dash cam confirmed, that when Anthony saw the gun, he had a different vantage point. After entering the parking lot and heading south behind a row of cars, the officers drove behind Stevenson's car, turned right, and approached the driver's side from the west (such that the two vehicles would eventually be parallel to one another). (*See* Hrg. Ex. 4; Ex. 2 at 0:01–0:22.) By that time, Anthony was sitting lower in the SUV and was a few feet further back from Stevenson's car. This positioning and angle, he says, gave him a better vantage point to see the gun in the small gap between the seat and the floor.

Stevenson argues there is reason to question Anthony's credibility given some discrepancies between his police report and suppression hearing testimony. As mentioned, Anthony's police report described Stevenson's position upon initial encounter as being in the driver's side door jamb, but he later testified that Stevenson was behind the B-pillar, which is further back. Anthony's report also describes the gun as protruding from the seat as opposed to being underneath the seat.

The first discrepancy does not cast doubt on Anthony's credibility. Anthony acknowledged that after a long shift, he made a mistake in his report about the door jamb. Further, these two areas of the car are separated by mere inches to a foot. And whatever Stevenson's position, Anthony said it did not obstruct his view and that he saw the gun with no obstruction.

As for the second discrepancy, Anthony testified that he indicated "protruding" in his report because he was trying to explain how he saw the firearm. He "believed that protruding was the best word to use because the gun was visible to [him]" from under the seat.

Having considered these discrepancies, the Court will credit Anthony's sworn testimony that he saw the firearm under Stevenson's seat. The Court understands Stevenson's skepticism given the location of the gun and the small gap between the seat and the floorboard. But Anthony gave a plausible explanation for his ability to see the gun, the dash cam footage supports his vantage point, he immediately told his partner the gun was in the car and under the seat—which was precisely where the gun was found—and this was the explanation given to Stevenson at the time of the incident. Thus, the Court is not prepared to find that Anthony (a) lied and (b) simply got lucky that a firearm happened to be under Stevenson's seat.

**B.**

Having determined that Anthony saw a firearm in Stevenson's car, the Court now turns to the propriety of Stevenson's seizure and the search of his vehicle.

**1.**

There is no dispute that after Anthony saw the gun in Stevenson's car, the officers approached the car, asked Stevenson if he had a concealed pistol license, and placed him in handcuffs.

A brief, investigatory stop is valid under *Terry v. Ohio*, 392 U.S. 1 (1968), "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). When making a reasonable-suspicion determination, the Court "'must look at the totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

"In Michigan, it is a crime to carry a pistol in a vehicle without a firearm license." *Galaviz*, 645 F.3d at 356 (citing Mich. Comp. Laws § 750.227). But the individual has the burden of demonstrating that he has a license to carry the pistol. Mich. Comp. Laws § 776.20. "As a result of this statutory structure," says the Sixth Circuit, "merely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful." *United States v. Williams*, 483 F. App'x 21, 27 (6th Cir. 2012) (citing *People v. Henderson*, 218 N.W.2d 2, 4 (Mich. 1974)). "In other words, an individual carrying a concealed weapon is committing a crime unless the individual has a valid CPL." *See United States v. Leverett*, No. 19-cr-20098, ECF No. 36 (E.D. Mich. July 24, 2019).

Because the presumption is that it is unlawful for a firearm to be concealed in a vehicle, when Anthony saw a gun under the driver's seat of Stevenson's car, the officers had reasonable suspicion to believe that Stevenson was unlawfully possessing a concealed weapon. *See United States v. Ferguson*, No. 19-3894, 2020 WL 10140803, at *3 (6th Cir. June 3, 2020) (where Ohio law, like Michigan law, generally prohibits having a firearm in a motor vehicle and places the burden on defendant to establish his licensure, Court found officer had reasonable suspicion to seize defendant when he saw a firearm in the backseat of defendant's car); *see also United States v. Pope*, 910 F.3d 413, 415–16 (8th Cir. 2018) (like Michigan, "carrying a concealed weapon in Iowa is presumptively criminal until the suspect comes forward with a permit, and we see no reason why the suspect's burden to produce a permit should be any different on the street than in the courtroom. We thus think the officer had reasonable suspicion that criminal activity was afoot when he personally observed Pope place the gun in his waistband."); *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (holding that reasonable suspicion existed for a *Terry* stop because "under Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise.") This entitled the officers to conduct a brief investigatory stop to inquire into Stevenson's ability to possess a concealed weapon. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (recognizing that, during a *Terry* stop, officer may "try to obtain information confirming or dispelling the officer's suspicions").

Stevenson questions the existence of reasonable suspicion. He says, "there was no unusual conduct to believe that criminal activity was afoot." (ECF No. 27, PageID.86.) But this is premised on his argument that Anthony could not have seen the firearm in the vehicle, which the Court has already rejected.

More to the point, Stevenson characterizes his initial seizure as an arrest for which probable cause was lacking, and not a *Terry* stop, because he was immediately placed in handcuffs and was not free to leave.

While an arrest and investigative detention share similar hallmarks, the Sixth Circuit has made clear that handcuffing as a safety precaution "is appropriate even when police are merely detaining, but not arresting, a suspect." *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). "[T]he use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir.1999). Indeed, "holding subjects at gunpoint, handcuffing them, and placing them in a squad car does not turn a *Terry* stop into an arrest where the police officers 'reasonably fear that suspects are armed and dangerous.'" *United States v. Boyett*, 295 F. App'x 781, 785 (6th Cir. 2008) (quoting *Houston*, 174 F.3d at 815 (6th Cir. 1999)).

Here, the officers had reason to believe that Stevenson was carrying a concealed firearm. Stevenson was within arms-reach of the firearm. And Anthony had concerns that Stevenson might be in possession of another firearm and, from his movements, might try to flee. Restraining Stevenson for the officers' safety while they

investigated his concealed pistol license status did not transform the *Terry* stop into an unlawful arrest. *See United States v. Edwards*, No. 19-20479, 2019 U.S. Dist. LEXIS 185987, at *13–14 (E.D. Mich. Oct. 28, 2019) (finding that where defendant was handcuffed for only seconds before the officer found the gun under his car seat, "the brief, reasonable measures used by the deputies . . . did not convert the investigatory detention into an unlawful arrest"); *United States v. Bridges*, No. 16-20089, 2016 WL 3922354 (E.D. Mich. July 21, 2016) (as part of *Terry* stop, officers were entitled to handcuff defendant, place him in patrol car, and check computer to determine if he had a concealed pistol license). Indeed, Anthony testified, without contradiction, that the initial seizure was temporary and that Stevenson would have been released had he produced a concealed pistol license.

**2.**

As part of the *Terry* stop, the officers were also permitted to retrieve the firearm from the car.

An officer may perform a protective sweep of the passenger compartment of a car if he has "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of the weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Despite Stevenson's argument to the contrary, "A search based on such reasonable suspicion is permissible even if the suspect is detained outside the car because 'if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will

then have access to any weapons inside.'" *United States v. McCraney*, 674 F.3d 614, 620 (6th Cir. 2012) (quoting *Long*, 463 U.S. at. 1052). In other words, with a temporary detention as opposed to an arrest, "the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." *United States v. Gant*, 556 U.S. 332, 352 (2009) (Scalia, J., concurring); *accord United States v. Lurry*, 483 F. App'x 252, 255 (6th Cir. 2012).

Anthony immediately retrieved the firearm after putting Stevenson in handcuffs. At that moment, Stevenson had not yet been arrested. Because Stevenson could have returned to the vehicle following the investigative stop—if he had a concealed pistol license—the search was proper. *See United States v. Graham*, 483 F.3d 431, 440 (6th Cir. 2007) (finding search of the car proper where handcuffed defendant was merely detained, but not under arrest, because "[h]ad the officers not searched the car and simply let him go, [defendant] would immediately have had access to the weapon once he reentered the car").

Stevenson contests the propriety of the search because the officers did not know his criminal history or whether he possessed the firearm lawfully under Michigan law. In rejecting a similar argument concerning Tennessee law, the Sixth Circuit explained that "the Supreme Court [has] . . . rejected the claim that the validity of the search rests on whether the weapon is lawfully possessed." *United States v. Terrell*, 95 F. App'x 746, 748 (6th Cir. 2004); *see also Lurry*, 483 F. App'x at 255 (same).

In sum, considering the totality of the circumstances, the officers had reasonable suspicion to believe that Stevenson was violating Michigan law by having a concealed firearm in his vehicle. This entitled them to temporarily detain Stevenson to investigate further. Knowing that Stevenson was within reach of the firearm, but not knowing if he had any other firearms or if he planned to flee, Anthony did not exceed the scope of the *Terry* stop by restraining Stevenson and removing the firearm from the vehicle. There is no Fourth Amendment violation to support suppression of the firearm.

**3.**

This same result would follow even if the nature of the stop did not justify the officers' seizure of the firearm because Stevenson was in handcuffs and no longer a threat.

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). But there are limited exceptions to this warrant requirement, including the automobile and plain-view exceptions. "The automobile exception allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Galaviz*, 645 F.3d at 354 (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). "The test for 'probable cause' is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal quotation marks omitted). "Under the plain-view doctrine, 'if police are lawfully in a position

from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *Galaviz*, 645 F.3d at 354 (quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)).

In *Galaviz*, the Sixth Circuit applied these exceptions where, as here, Michigan law enforcement officers observed a handgun in a vehicle. In that case, police officers thought defendant's car might have been involved in a robbery. They followed the car until defendant pulled into a driveway and entered the home. While defendant was still inside the home, officers at the scene inspected the car and observed what looked like part of a handgun sticking out from under the front seat. Once the car was unlocked, the officers seized a revolver located on the driver's side floor, partially under the seat.

After being indicted for being a felon in possession of a firearm, Galaviz challenged the seizure of the firearm. The Sixth Circuit, noting that the burden of establishing possession of a concealed pistol license is on the defendant in Michigan, *id*. at 356 (citing Mich. Comp. Laws § 776.20), found that the officers were lawfully in a position to view the gun and "the incriminating nature of a handgun in [a] vehicle was immediately apparent." *Id*. at 355–56 (citing Mich. Comp. Laws § 750.227). The Court then explained that the final factor, lawful right of access to the object, turned on the application of the automobile exception. And "probable cause was supplied when officers viewed the gun in the car, which constitutes a violation of Mich. Comp. Laws § 750.227." *Id*. at 357.

The same reasoning applies here. Stevenson was in a parking lot with his car door open. Officers Wafer and Anthony were on routine patrol. As they approached the car, Anthony saw the firearm in the vehicle. Because "in Michigan, it is a crime to carry a pistol in a vehicle without a firearm license . . . the incriminating nature of a handgun in the vehicle was immediately apparent." *Id.* at 356. It was then Stevenson's responsibility to establish his licensure status, which he failed to do.

Stevenson contends that "when officers pulled up next to [his] vehicle, they did not ask whether he had a CCW permit." (ECF No. 27, PageID.83.) This is not accurate. The body cam footage makes clear that this is the first thing Wafer asked Stevenson—even before the gun was retrieved. Thus, the seizure of the firearm was valid under the plain-view and automobile exceptions.[1]

Stevenson's briefs make no mention of this Michigan law. Yet it is this law that forecloses many of his arguments, including his reliance on *United States v. Lurry*, 483 F. App'x 252 (6th Cir. 2012). In *Lurry*, the Court explained that "the criminality of the shotgun shells was not immediately apparent because Lurry's possession of them was illegal only due to his status as a felon." *Id.* But Lurry was arrested in Tennessee, and "Tennessee permits an ordinary person to transport shotgun shells in a vehicle, or even a shotgun as long as there is no ammunition in the chamber." *Id.* (citing Tenn. Code Ann. § 39-17-1307(e)(1)). Thus, under Tennessee law, the

---

[1] The Court interprets the government's inevitable discovery argument as an offshoot of the automobile exception. Whatever transpired during the *Terry* stop, it was always going to reveal that Stevenson did not have a concealed pistol license. And this would have ultimately provided probable cause to search the automobile.

incriminating nature of the ammunition was not apparent until the officers knew the defendant's criminal history. *Id.* at 253–54. As the Sixth Circuit made clear in *Galaviz*, however, that is not the case under Michigan law with respect to a firearm in a vehicle.

Accordingly, the search of Stevenson's vehicle did not violate the Fourth Amendment.

**C.**

Finally, Stevenson's ultimate arrest was also supported by probable cause. In making this determination, the Court asks "whether, at the moment the arrest was made, . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Anthony testified that Stevenson was arrested as soon as Wafer saw the suspected narcotics in the car. "While conducting [the] lawful search of the passenger compartment of [Stevenson's] car, the police were not required to ignore the [suspected] cocaine" in the driver's door compartment. *Terrell*, 95 F. App'x at 748. This gave the officers probable cause to arrest Stevenson for a controlled substance violation.

Additionally, when Stevenson failed to produce a concealed pistol license and the LEIN search revealed that Stevenson did not have a concealed pistol license, the

officers had probable cause to arrest him as well for carrying a concealed weapon. *See United States v. Lamb*, No. 16-20077, 2016 U.S. Dist. LEXIS 105217, at *10–11 (E.D. Mich. July 6, 2016) ("Ample authority demonstrates that [Officer] Gardner had probable cause to arrest Lamb based upon his possession of the gun, and that Lamb carried the burden of producing proof that he had a CPL license. Lamb did not carry that burden because he never produced a CPL license." (citations omitted)), *adopted by*, 2016 U.S. Dist. LEXIS 104609 (E.D. Mich. Aug. 9, 2016).

**III.**

For all of these reasons, Stevenson's motion to suppress and motion to dismiss are DENIED.

IT IS SO ORDERED.

Dated: November 30, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE